## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| AMANDA PERKINS, HEATHER C. HOLST, TERRY J. WILLIAMS, TANYA C. STANDIFER and KARLEY MAYHILL, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | **CIVIL ACTION NO.:** |
| Plaintiffs, | ) ) ) | **3:21-CV-00973-X** |
| v. | ) ) | |
| UNITED SURGICAL PARTNERS INTERNATIONAL, INC. and THE RETIREMENT PLAN ADMINISTRATION COMMITTEE OF UNITED SURGICAL PARTNERS INTERNATIONAL, INC. | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs, Amanda Perkins, Heather C. Holst, Terry J. Williams, Tanya C. Standifer and Karley Mayhill ("Plaintiffs"), by and through their attorneys, on behalf of the United Surgical Partners International, Inc. 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.      INTRODUCTION

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. In addition, in 2019 the name of the Plan changed from the United Surgical Partners International Inc. 401(k) Plan to its current name, the Tenet Healthcare Corporation 401(k) Retirement Savings Plan ("Tenet Plan") with the Tenet Plan being the surviving Plan. Both will be referred to collectively here as the Plan.

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include United Surgical Partners International, Inc. ("United Surgical" or "Company") and the Retirement Plan Administration Committee of United Surgical Partners International, Inc. and its members during the Class Period[2] ("Committee") for breaches of their fiduciary duties.[3]

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process

---

[2]The Class Period, as will be discussed in more detail below, is defined as April 30, 2015 through December 31, 2018.

[3] In 2019, the Plan changed its name from the United Surgical Partners International, Inc. 401(k) Plan to the Tenet Healthcare Corporation 401(k) Retirement Savings Plan ("Tenet Plan"), with the Tenet Plan being the surviving Plan. This change reflects Tenet's incremental acquisition of United Surgical which began in 2015 with a 50.1% interest and which finally became a 95% ownership interest in 2019. Based on Tenet's ownership percentage of United Surgical throughout the Class Period, United Surgical was and is currently a wholly owned subsidiary of Tenet. Accordingly, the name of the Committee in 2020 is the Retirement Plan Administration Committee of Tenet Healthcare ("RPAC"), however, the exact name of this Committee in 2018 and prior years is not known but is generally referred to herein as the Retirement Plan Administration Committee of United Surgical Partners International, Inc. but it may have had this or another similar name and a similar function, as will be described in more detail below, during the Class Period and both will be referred to herein as the Committee.

for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.       Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.       "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

6.       Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.       The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 16, 2021) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.      Because cost-conscious management is fundamental to prudence in the investment function, the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

9.      At all times during the Class Period (April 30, 2015 through December 31, 2018) the Plan had at least 290 million dollars in assets under management.  At the end of 2017 and 2018, the Plan had over 455 million dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.      The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.      Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping and administrative ("RKA") costs.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

17.     Plaintiff, Amanda Perkins ("Perkins"), resides in St. Peter, Missouri. During her employment, Plaintiff Perkins participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit and was subject to excessive RKA costs.  As alleged

below, all the funds in the Plan during the Class Period paid revenue sharing which was in turn used to pay for the excessive RKA costs. Accordingly, Plaintiff Perkins suffered injury to her Plan account by overpaying for her share of RKA costs.

18.    Plaintiff, Heather C. Holst ("Holst"), resides in Riverview, Florida. During her employment, Plaintiff Holst participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit and was subject to excessive RKA costs. Plaintiff Holst invested in the T Rowe Price Retirement 2040 Fund ADV target date fund during the Class Period, but upon information and belief the assets in this fund was mapped in 2020 to the 2040 target date fund when the T Rowe Price fund was removed. As alleged below, all the funds in the Plan during the Class Period paid revenue sharing which was in turn used to pay for the excessive RKA costs. Accordingly, Plaintiff Holst suffered injury to her Plan account by overpaying for her share of RKA costs.

19.    Plaintiff, Terry J. Williams ("Williams"), resides in Garland, Texas. During his employment, Plaintiff Williams participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit and was subject to excessive RKA costs. Plaintiff Williams specifically invested in the funds referenced in this Complaint, namely, but not limited to, the PIMCO Total Return Fund, Invesco Comstock Y, State St S&P 500 Indx Sec Lending VII, Fidelity Blue Chip Growth, Victory Sycamore Established Value I, Principal MidCap RS, JPMorgan Small Cap Growth I and Invesco Oppenheimer International Gr Y. As alleged below, all the funds in the Plan during the Class Period paid revenue sharing which was in turn used to pay for the excessive RKA costs. Accordingly, Plaintiff Williams suffered injury to his Plan account by overpaying for his share of RKA costs.

20.    Plaintiff, Tanya C. Standifer ("Standifer"), resides in Sandy Spring, Georgia. During her employment, Plaintiff Standifer participated in the Plan investing in the options offered

by the Plan and which are the subject of this lawsuit and was subject to excessive RKA costs. Plaintiff Standifer specifically invested in the funds referenced in this Complaint, namely, but not limited to, the T Rowe Price Retirement 2040 Fund ADV, Invesco Comstock Y, State St S&P 500 Indx Sec Lending VII and JPMorgan Small Cap Growth I.  As alleged below, all the funds in the Plan during the Class Period paid revenue sharing which was in turn used to pay for the excessive RKA costs.  Accordingly, Plaintiff Standifer suffered injury to her Plan account by overpaying for her share of RKA costs.

21.     Plaintiff, Karley Mayhill ("Mayhill"), resides in Edwardsville, Illinois. During her employment, Plaintiff Mayhill participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit and was subject to excessive RKA costs.  Plaintiff Mayhill invested in the State St S&P 500 Indx Sec Lending VII fund during the Class Period but the assets in this fund were mapped to the S&P 500 Index fund in 2020 when the State Street fund was removed from the Plan. As alleged below, all the funds in the Plan during the Class Period paid revenue sharing which was in turn used to pay for the excessive RKA costs.  Accordingly, Plaintiff Mayhill suffered injury to her Plan account by overpaying for her share of RKA costs.

22.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts during the Class Period, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans,

information regarding other available identical funds, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

24.     United Surgical was the Plan sponsor and a named fiduciary during the Class Period which had a principal place of business during the Class Period as 15305 Dallas Parkway, Suite 1600, Addison, TX 75001. It's address for service of process is currently that of the Tenet Healthcare Corporation ("Tenet") because United is a wholly owned subsidiary of Tenet. The December 31, 2020 Form 10-K of the Tenet Healthcare Corporation ("Tenet Annual Report") at Page 30 of Exhibit 21. Tenet's address for service of process, as the Plan Administrator, is 14201 Dallas Parkway, Dallas, Texas 75254.  The December 31, 2019 Form 5500 of the Tenet Healthcare Corporation 401(k) Retirement Savings Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.

25.      United Surgical describes itself as "the largest ambulatory surgery platform in the country.[5]" United Surgical currently employs more than 21,000 employees in 30 States across the Country. *Id.*

26.     United Surgical appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Summary Plan Description of the Tenet Healthcare Corporation 401(k) Retirement Savings Plan dated January 1, 2020 ("SPD") at 26 and

---

[5] https://www.uspi.com/about-us.aspx last accessed on April 5, 2021.

43. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

28.     Accordingly, United Surgical during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

**Committee Defendants**

29.     The Committee ensures that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers.

30.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

31.     The Committee and unnamed members of the Committee during the Class Period are collectively referred to herein as the "Committee Defendants."

### IV.     CLASS ACTION ALLEGATIONS

32.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 30, 2015 through December 31, 2018 (the "Class Period").

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

33.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 lists 16,605 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

34.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

35.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

36.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the

vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

37.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

38.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

39.    The Plan was established Effective February 1, 1999. The December 31, 2018 Report of the Independent Auditor for the United Surgical Partners International, Inc. 401(k) Plan ("2018 Auditor Report") at 5. As further described in the 2018 Auditor Report: "United Surgical Partners International, Inc. (the Company) established the Plan to provide benefits to employees of the Company." *Id.* In 2019 the Plan changed it's name to the Tenet Healthcare Corporation 401(k) Retirement Savings Plan ("Tenet Plan") to reflect Tenet's more than 95% ownership of United Surgical by 2019. The Tenet Healthcare Corporation 401(k) Retirement Savings Plan as Amended and Restated Effective January 1, 2020 ("Plan Doc") at 9. However, the Class Period

relates only to the time period when the Plan remained under the United Surgical name from 2015 to the end of 2018.

40.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. 2018 Auditor Report at 5.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

41.     In general, regular full-time employees are eligible to participate in the Plan. 2018 Auditor Report at 5.

### *Contributions*

42.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

43.     With regard to employee contributions, "participants could contribute up to 50% of pretax annual compensation, as defined in the Plan document." *Id.* United Surgical could have decided to make matching contributions to the Plan on behalf of their employees. As detailed in the 2018 Auditor Report: "[t]he Company could elect to make discretionary matching contributions to the Plan. The Company matched 50% of employee contributions, of each participant's contribution on the first 6% of eligible compensation deferred to the Plan." *Id.*

44.     Like other companies that sponsor 401(k) plans for their employees, United Surgical enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.  *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

45.     United Surgical and its clients also benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover."  *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

46.     Given the size of the Plan, United Surgical likely enjoyed a significant tax and cost savings from offering a match.

### Vesting

47.     Participants are immediately vested in their own contributions made to the Plan. 2018 Auditor Report at 6. With regard to contributions made by United Surgical, participants are subject to a four year vesting schedule before those contributions are considered earned. *Id*.

### The Plan's Investments

48.     In theory, the Committee responsibilities include selection and monitoring of the funds available for investment in the Plan.  However, the Committee must carry out this fiduciary responsibility for the exclusive benefit of the plan participants and beneficiaries. But in practice, as alleged below, that is not what happened.

49.     Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. SPD at 26 and 43.

50. The Plan's assets under management for all funds as of December 31, 2018 was $455,880,455.  2018 Auditor Report at 3.

### *Payment of Plan Expenses*

51. During the Class Period, administrative expenses were paid for using Plan assets. As described in the 2018 Auditor Report: "[p]articipant accounts were charged with an allocation of administrative expenses that were paid by the Plan." 2018 Auditor Report at 5.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

52. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

53. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

54. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs. Defendants also failed to monitor and curtail the unreasonable RKA costs incurred by the Plan.

### A.    The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

#### (1)    The Plan's Total Plan Costs Were the Highest in its Peer Group

55. "Many types of services are required to operate a [defined contribution] plan, including administrative services (*e.g.*, recordkeeping and transaction processing), participant-

focused services (*e.g.*, participant communication, education, or advice), regulatory and compliance services (*e.g.*, plan document services; consulting, accounting, and audit services; and legal advice), and investment management." [7]

56.     "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst, "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios." The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 ("ICI Study") at 55 available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf.

57.     Costs are, of course, important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17.[8]

58.     One indication that the Plan was poorly run is its dismal ranking among peers when comparing total plan costs.  As of 2018, the Plan was ranked by BrightScope as having one of the highest overall plan costs of any Plan with between 100 million and 500 million dollars in assets under management.  In fact, BrightScope finds that the average participant would have to work an additional 17 years and will have lost at least $84,000 as a result of the Plan's high costs.  *See* https://www.brightscope.com/401k-rating/356165/United-Surgical-Partners-International-Inc/361092/United-Surgical-Partnersn-International-Inc-401K-Plan

59.     According to the ICI Study, the median total plan cost for a plan between 250 million dollars and 500 million dollars is 0.43% of total assets in a plan.  ICI Study at 57.  Here, the total Plan costs during the Class Period ranged from a high of 0.82% in 2018 to a low of 0.79% in 2016. There's little question the Plan was paying at least ***83% more*** in total plan costs than its

---

[7] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[8] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success

peers. These excessive costs should have been addressed by the Defendants during the Class Period, but, again, this is something the Defendants failed to do to the great detriment of Plan participants.

> **(2)      The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period**

60.      Another indication of Defendants' imprudent process was the excessive RKA fees Plan participants were required to pay to the Plan's recordkeeper, ADP, during the Class Period.

61.      Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees*," *supra*, at n.3.

62.      The Restatement of Trusts also puts cost-conscious management above all else while administering a retirement plan.  *Tibble*, 843 F.3d at 1197-98.

63.      RKA (recording keeping and administration as explained above) refers to the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  As noted above, ADP was the Plan's recordkeeper.

64.      There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

> **A.** Recordkeeping;
>
> **B.** Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

**C.** Administrative services related to converting a plan from one recordkeeper to another;

**D.** Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

**E.** Maintenance of an employer stock fund (if needed);

**F.** Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

**G.** Plan consulting services, including assistance in selecting the investment lineup offered to participants;

**H.** Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[9] (excluding the separate fee charged by an independent third-party auditor);

**I.** Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

**J.** Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

65. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita

---

[9] The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

price), regardless of the services chosen or utilized by the plan.  The services chosen by a large

plan do not affect the amount charged by recordkeepers for such basic and fungible services.

66.     The second type of essential recordkeeping services, hereafter referred to as "A La

Carte" services, provided by all national recordkeepers, often has separate, additional fees based

on the conduct of individual participants and the usage of the services by individual participants.

These fees are distinct from the bundled arrangement described above to ensure that one participant

is not forced to help another cover the cost of, for example, taking a loan from their plan account

balance.  These A La Carte services typically include, but are not limited to, the following:

    **A.**  Loan processing;

    **B.**  Brokerage services/account maintenance (if offered by the plan);

    **C.**  Distribution services; and

    **D.**  Processing of qualified domestic relations orders.

67.     All national recordkeepers have the capability to provide all of the aforementioned

recordkeeping services at very little cost to all large defined contribution plans, including those

much smaller than the Plan.  In fact, several of the services, such as managed account services,

self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are

often a profit center for recordkeepers.

68.     ADP provided services in line with the routine bundled and A La Carte service

categories described above.  The RKA services performed each year during the Class Period were

similar so we can look at the Plan's 2018 Form 5500, Schedule C as an example.  The Schedule C

lists the following codes indicating the type of general services performed by the recordkeeper:

37, 15, and 64.  The codes mean the following:

        37 – Participant loan processing

15 – Recordkeeping and information management (computing, tabulating, data processing, etc.)

64 – Recordkeeping fees

*See* Instructions for Schedule C (Form 5500) *available at* https://www. dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2019-instructions.pdf.

69.     Again, the above services are not out of the ordinary of the services other national recordkeepers provide.  And as noted earlier participant loan processing is a service that can be provided for next to nothing.

70.     The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.   Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

71.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

72.     During the Class Period all the Plan's funds paid revenue sharing to the Plan's recordkeeper. Looking at 2018 as a representative sample of the entire Class Period, revenue sharing was paid as follows:

| | | |
|---|---|---|
| PIMCO Total Return Fund | $ 23,436,438 | 0.10% |
| Franklin Rising Dividend Advisor Class | 11,637,069 | 0.25% |

| | | |
|---|---|---|
| Victory Established Value I | 15,999,513 | 0.10% |
| Deutsch Small Cap Core Fund – S | 9,499,673 | 0.45% |
| Hartford Mid-Cap Y | 17,634,303 | 0.10% |
| Oppenheimer International Growth – Y | 17,758,437 | 0.25% |
| JP Morgan Small Cap Growth – Class SE | 18,722,383 | 0.35% |
| BlackRock Global Allocation Fund, Inc. – Class A | 6,632,271 | 0.25% |
| Fidelity Blue Chip Growth Fund | 36,190,864 | 0.25% |
| T. Rowe Price Retirement Income Fund – Advisor Class | 7,154,034 | 0.15% |
| T. Rowe Price Retirement Income 2010 Fund – Advisor Class | 5,026,186 | 0.15% |
| T. Rowe Price Retirement Income 2020 Fund – Advisor Class | 36,281,816 | 0.15% |
| T. Rowe Price Retirement Income 2030 Fund – Advisor Class | 54,265,870 | 0.15% |
| T. Rowe Price Retirement Income 2040 Fund – Advisor Class | 43,177,251 | 0.15% |
| T. Rowe Price Retirement Income 2050 Fund – Advisor Class | 29,574,060 | 0.15% |
| T. Rowe Price Retirement Income 2060 Fund – Advisor Class | 1,274,704 | 0.15% |
| Principal Midcap R5 | 12,950,524 | 0.35% |
| INVESCO Comstock Fund – Class Y | 17,340,265 | 0.25% |
| INVESCO Stable Asset Fund | 35,333,449 | 0.20% |
| *     SSgA S&P 500 Fund Index VII  0.21% | 30,198,608 | 0.11% |
| *     SSgA RUSS SC IDX VI ER-0.51% | 5,221,837 | 0.30% |
| *     SSgA S&P MD CP IDX NL G  0.46% | 3,769,265 | 0.12% |
| *     SSgA S&P US BD IDX SL VII  0.46% | 4,843,117 | 0.18% |

73.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee

that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

74.     In this matter, using revenue sharing to pay for RKA resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market RKA fees.

75.     As demonstrated in the chart below, the Plan's per participant RKA fees were as follows:

| Year | Participants | Direct Costs | Indirect Costs | Total | $PP |
|------|--------------|--------------|----------------|-------|-----|
| 2018 | 16605 | $328,716 | $1,304,352 | $1,633,068 | $98.35 |
| 2017 | 15629 | $84,043 | $1,240,948 | $1,324,991 | $84.78 |
| 2016 | 14663 | $66,822 | $978,413 | $1,045,235 | $71.28 |
| 2015 | 11855 | $57,491 | $844,504 | $901,995 | $76.09 |

76.     These amounts were grossly above market rates when benchmarked against similar plans.  By way of comparison, we can look at what other similar plans paid for RKA fees during the same time period.

77.     The Plan had over 15,000 participants making it eligible for some of the lowest fees on the market.

78.     NEPC, a consulting group, which recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[10]  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See,* Report at 1.

---

[10] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

79.     NEPC's survey found that ***no plan*** with over 15,000  participants paid more than $69 per participant in recordkeeping, trust and custody costs (RKA) fees.  Report at 10. However, only 5% of the Plans surveyed paid $69 which is a maximum paid by any Plan with over 15,000 participants and itself should be considered high. *Id.* The average plan paid no more than $40 in RKA fees. *Id.* The Plan's failure to control these fees has cost the plan participants millions of dollars in lost savings.

80.     We can also look at what competitor plans paid for the same basket of services. Based upon publicly available information available to Defendants at all relevant times, it was possible for the Plan to negotiate materially lower RKA fees. The table below summarizes the RKA fees paid by plans of similar size and assets under management, and illustrates that the RKA fees paid by the Plan were materially higher in comparison.

| Comparable Plans' RKA Fees Paid in 2019[11] | | | | | |
|---|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total RKA Costs[12] | RKA Costs on Per-Participant Basis | Recordkeeper |
| Optumcare Management, LLC 401(k) Retirement Savings Plan | 10,072 | $843,224,007 | $223,361 | **$22** | Fidelity |
| Pacific Architects and Engineers, LLC 401(k) Savings Plan | 14,698 | $435,391,716 | $344,477 | **$23** | Fidelity |
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 18,674 | $939,399,569 | $458,770 | **$25** | Vanguard |
| Sutter Health Retirement Income Plan | 12,205 | $515,927,887 | $375,153 | **$31** | Fidelity |
| Penn State Health 401(k) Savings Plan | 15,020 | $1,646,231,456 | $519,693 | **$35** | Great-West |
| First American Financial Corporation 401(K) Savings Plan | 15,246 | $1,791,281,396 | $529,171 | **$35** | Fidelity |
| Michelin 401(k) Savings Plan | 16,335 | $2,817,613,558 | $581,292 | **$36** | Vanguard |
| The Tax Sheltered Annuity Plan of Texas Children's Hospital | 14,676 | $1,271,086,311 | $547,910 | **$37** | Fidelity |
| Fortive Retirement Savings Plan | 14,375 | $1,885,682,190 | $552,129 | **$38** | Fidelity |

81.     Since at least the mid-2000s, the fees that RKA service providers are willing to accept for providing recordkeeping and administrative services has decreased steadily.

82.     The underlying costs to a recordkeeper of providing RKA services to a plan are primarily dependent upon the number of participant accounts in the plan rather than the value of assets under management in the plan.

---

[11] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is close in proximity to 2018, the exemplar year used to analyze the Plan's fees.

[12] RKA costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees as noted above.  These fees do not necessarily include participant loan processing, but as explained above, fees for those services are negligible.  Certainly, they would not account for double the amount of the other services.

83.     Recordkeepers for larger defined contribution plans like the Plan experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans.

84.     When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

85.     A plan with more participants can and will receive a lower per-participant fee relative to a smaller plan. This is well known among retirement plan professionals, including RKA service providers and 401(k) administrators.

86.     Prudent plan fiduciaries ensure that they are paying only reasonable fees for RKA services by soliciting competitive bids – *i.e.*, a request for proposal ("RFP") – from other recordkeepers to perform the same services being provided to the plan. This is not a complex process and is performed regularly by prudent plan fiduciaries. Fiduciaries commonly request periodic competitive bids from other service providers so they can determine if the current level of fees being charged for RKA services is reasonable.

87.     The most effective way to determine the true market price at any given time is to obtain competitive quotes through this bidding process. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (failure to solicit bids, and paying higher-than-market recordkeeping fees, supported triable breach of fiduciary duty claim).

88.     By soliciting bids from other providers, prudent plan fiduciaries can quickly and easily gain an understanding of the current market for similar RKA services.

24

89.     By going through an RFP process every few years, prudent plan fiduciaries can review the level of service provided by the current recordkeeper and compare the fees to those being offered by other reputable recordkeepers. The bidding process can also give plan fiduciaries leverage to negotiate lower fees with their current RKA provider should they prefer to stay with their existing provider.

90.     Fiduciary best practices, based on Department of Labor guidelines and marketplace experience, were known or should have been known by Defendants. Prudent fiduciaries should implement the following three related processes, among others, to reasonably manage and control a plan's recordkeeping and administrative costs. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that 401(k) plan administrators breach their fiduciary duties when they "fail[] to monitor and control recordkeeping fees"); *Kraft Foods*, 641 F.3d at 800 (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

91.     First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the plan relative to the services provided. A prudent fiduciary closely tracks fee payment levels and the level of services being provided in exchange for the fees.

92.     Second, to make an informed evaluation as to whether a service provider is receiving no more than a reasonable fee for the services provided to the plan, a prudent fiduciary must identify all fees, including direct and indirect compensation being paid to the service provider.

93.     Third, a plan fiduciary must remain informed about overall trends in the marketplace regarding fees being paid by other plans, particularly comparably sized plans. This will include monitoring the fees paid by similar plans, and also conducting an RFP bid process at reasonable intervals to ensure the plan's fees remain reasonable. A bidding process should take

place periodically as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or if fee benchmarking reveals that the recordkeeper's compensation exceeds levels found in similar plans.

94.     During the class period, Defendants knew or should have known that they must regularly monitor the Plan's RKA fees. Defendants knew or should have known that they must regularly solicit competitive bids from service providers to avoid paying unreasonable fees for RKA services.

95.     Defendants failed to properly monitor, renegotiate, and minimize the Plan's RKA fees. Defendants did not engage in objectively reasonable or prudent efforts to ensure that the Plan paid no more than competitive reasonable fees for RKA services.

96.     Because Defendants failed to properly monitor the Plan's RKA fees, the fees were materially higher than they would have been had Defendants engaged in a prudent process.

97.     The table above shows the Plan's annual RKA fees on a per-participant basis. The table illustrates that the Plan paid an average of **$83 per participant per year**. This amount is materially higher than industry averages, as discussed above.  Indeed, it is more than double what other similarly situated plans receiving the same general basket of services paid.  Participant loan processing fees alone cannot account for this discrepancy.  Indeed, many recordkeepers in recent years have entirely waived any fees associated with loan processing.  *See* Principal joins list of record keepers cutting fees on loans, hardship withdrawals | Pensions & Investments (pionline.com)(https://pionline.com//defined-contribution/principal-joins-list-record-keepers-cutting-fees-loans-hardship-withdrawals)

98.     Given the size of the Plan's assets during the Class Period and the total number of participants in addition to the general trend towards lower recordkeeping expenses in the

marketplace as a whole, the Plan could have obtained RKA services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

99.     Additionally, because Plan participants were paying more for RKA than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay RKA costs via revenue sharing.

100.    Moreover, despite the amount of revenue sharing charged by the Plan, there is no indication that the Plan's fiduciaries returned the revenue sharing collected from the Plan's investments back to the Plan's participants as they should have.

### (3)    There Was Little to No Change in Plan Investment Options for the Entirety of the Class Period

101.    Another indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan retained 11 mutual funds which have remained unchanged since 2013. As of 2018, these 11 funds harbored more than 256 million dollars in participant assets. These 11 funds remained as investment options since 2013 despite the fact that these funds charged grossly excessive fees compared with identical, comparable and/or superior alternatives, and despite ample evidence available to a reasonable fiduciary that the costs associated with these funds were imprudently high. The following funds in the Plan stayed unchanged from 2013 to 2018:

| Fund in the Plan 2018 | Years in Plan | Assets Under Management |
|---|---|---|
| T Rowe Price Retirement 2030 Fund ADV | Since 2013 | $54,265,870 |
| T Rowe Price Retirement 2040 Fund ADV | Since 2013 | $43,177,251 |
| T Rowe Price Retirement 2050 Fund ADV | Since 2013 | $29,574,060 |
| PIMCO Total Return Fund | Since 2013 | $23,436,438 |
| Principal MidCap Fund  R5 | Since 2013 | $12,950,524 |
| T Rowe Price Retirement 2010 Fund ADV | Since 2013 | $5,026,186 |
| JPMorgan Small Cap Growth Fund R5 | Since 2013 | $18,722,383 |
| Franklin Rising Dividends Fund ADV | Since 2013 | $11,637,069 |
| T Rowe Price Retirement 2060 Fund ADV | Since 2013 | $1,274,704 |
| Victory Sycamore Established Value Fund I | Since 2013 | $15,999,513 |

| Fund in the Plan 2018 | Years in Plan | Assets Under Management |
|---|---|---|
| State St S&P 500 Indx Sec Lending VII | Since 2013 | $30,198,608 |
| STATE ST S&P MD CP IDX NL F (G) | Since 2013 | $3,769,265 |
| BlackRock Global Allocation Instl | Since 2013 | $6,632,271 |
| | Total: | $256,664,142 |

102.    Out of the 23 funds in the Plan in 2018, 11 of them, or 47%, remained unchanged since 2013. Failure to remove or change imprudent funds to less expensive share classes or cheaper cost structures over the course of several years is a clear indication that Defendants were not monitoring the Plan's funds as they should have been.

### (4)    Many of the Plan's Funds had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans

103.    Another indication of Defendants' failure to prudently monitor the Plan's funds is that several of the mutual funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between 250 million and 500 million in assets). By the end of 2018, the Plan had $455,880,455 in assets.

104.    In 2018, all 18 of the mutual funds in the Plan were more expensive than comparable mutual funds found in similarly sized plans. And, as discussed above, 11 of these funds remained unchanged since 2013.  The expense ratios for funds in the Plan in some cases were up to *171%* (in the case of T. Rowe Price Retirement 2040 Advisor) and up to *102%* (in the case of JPMorgan Small Cap Growth I) above the median expense ratios in the same category: [13]

| ICI Median Chart | | | |
|---|---|---|---|
| Current Fund | 2021 Exp Ratio | Investment Style | ICI Median |
| T. Rowe Price Retirement 2030 Advisor | 0.90% | Target-date | 0.35% |

---

[13] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| T. Rowe Price Retirement 2040 Advisor | 0.95% | Target-date | 0.35% |
| T. Rowe Price Retirement 2020 Advisor | 0.83% | Target-date | 0.35% |
| Fidelity Blue Chip Growth | 0.80% | Domestic equity | 0.49% |
| T. Rowe Price Retirement 2050 Advisor | 0.96% | Target-date | 0.35% |
| PIMCO Total Return Admin | 0.96% | Domestic Bond | 0.44% |
| JPMorgan Small Cap Growth I | 0.99% | Domestic equity | 0.49% |
| Invesco Oppenheimer International Gr Y | 0.85% | International Equity | 0.55% |
| Hartford MidCap Y | 0.79% | Domestic equity | 0.49% |
| Invesco Comstock Y | 0.56% | Domestic equity | 0.49% |
| Victory Sycamore Established Value I | 0.60% | Domestic equity | 0.49% |
| Principal MidCap RS | 0.85% | Domestic equity | 0.49% |
| Franklin Rising Dividends Adv | 0.62% | Domestic equity | 0.49% |
| Deutsch Small Cap Core Fund - S | 0.89% | Domestic equity | 0.49% |
| T. Rowe Price Retirement Balanced Adv | 0.75% | Target-date | 0.35% |
| BlackRock Global Allocation Instl | 0.80% | Non-target date Balanced | 0.35% |
| T. Rowe Price Retirement 2010 Advisor | 0.77% | Target-date | 0.35% |
| T. Rowe Price Retirement 2060 Advisor | 0.96% | Target-date | 0.35% |

105.    The high cost of the Plan's funds is even more stark when comparing the Plan's

funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| T. Rowe Price Retirement 2030 Advisor | 0.90% | Target-date | 0.38% |
| T. Rowe Price Retirement 2040 Advisor | 0.95% | Target-date | 0.38% |
| T. Rowe Price Retirement 2020 Advisor | 0.83% | Target-date | 0.38% |

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| Fidelity Blue Chip Growth | 0.80% | Domestic equity | 0.44% |
| T. Rowe Price Retirement 2050 Advisor | 0.96% | Target-date | 0.38% |
| PIMCO Total Return Admin | 0.96% | Domestic Bond | 0.35% |
| JPMorgan Small Cap Growth I | 0.99% | Domestic equity | 0.44% |
| Invesco Oppenheimer International Gr Y | 0.85% | International Equity | 0.60% |
| Hartford MidCap Y | 0.79% | Domestic equity | 0.44% |
| Invesco Comstock Y | 0.56% | Domestic equity | 0.38% |
| Victory Sycamore Established Value I | 0.60% | Domestic equity | 0.38% |
| Principal MidCap RS | 0.85% | Domestic equity | 0.38% |
| Franklin Rising Dividends Adv | 0.62% | Domestic equity | 0.38% |
| Deutsch Small Cap Core Fund - S | 0.89% | Domestic equity | 0.38% |
| T. Rowe Price Retirement Balanced Adv | 0.75% | Target-date | 0.38% |
| BlackRock Global Allocation Instl | 0.80% | Non-target date Balanced | 0.42% |
| T. Rowe Price Retirement 2010 Advisor | 0.77% | Target-date | 0.38% |
| T. Rowe Price Retirement 2060 Advisor | 0.96% | Target-date | 0.38% |

106.    Although a good gauge of Defendants' imprudence, median-based and average-based comparisons still understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available (which Defendants failed to consider) that offered lower expenses than the median and average fees.

107.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2017 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for target date funds for plans with between

250 million dollars and 500 million dollars in assets was .58 using 2016 data[14] compared with

.35% in 2017.  Accordingly, the median expense ratios in 2021 utilized by similar plans would be

lower than indicated above, demonstrating a greater disparity between the 2021 expense ratios

utilized in the above chart for the Plan's current funds and the median expense ratios in the same

category.

>    **(5)    Several of the Plan's Funds Were Not in the Lowest Fee Share Class Available to the Plan**

108.    Another fiduciary breach stemming from Defendants' flawed investment

monitoring system resulted in the failure to identify available lower-cost share classes of many of

the funds in the Plan during the Class Period.

109.    Many mutual funds offer multiple classes of shares in a single mutual fund that are

targeted at different investors.  There is no difference between share classes other than cost—the

funds hold identical investments and have the same manager.  Because the institutional share

classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary

would know immediately that a switch is necessary.  *Tibble*, 2017 WL 3523737, at * 13.

110.    Generally, more expensive share classes are targeted at smaller investors with less

bargaining power, while lower cost shares are targeted at institutional investors with more assets.

Qualifying for lower share classes usually requires only a minimum of a million dollars for

individual funds.  However, it is common knowledge that investment minimums are often waived

for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019)

(citing *Tibble II*, 729 F.3d at 1137 n.24).

111.    Here, 15 of the 18 mutual funds in the Plan in 2018 or more than 83% of the funds

in the Plan in 2018 were not in the lowest share class and, as discussed above, 9 of these funds

---

[14] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019)
(hereafter, "2016 ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

have remained unchanged since 2013.  In 2018, the total assets under management for these funds
was more than 314 million dollars thus easily qualifying them for lower share classes.  The
following is a list of these funds and their assets under management as of the end of 2018:

| Fund in the Plan | 2018 Assets Under Management |
|---|---|
| T Rowe Price Retirement 2030 Fund ADV | $54,265,870.00 |
| T Rowe Price Retirement 2040 Fund ADV | $43,177,251.00 |
| T Rowe Price Retirement 2050 Fund ADV | $29,574,060.00 |
| PIMCO Total Return Fund; Admin | $23,436,438.00 |
| Fidelity Blue Chip Growth Fund | $36,190,864.00 |
| Invesco Oppen International Growth Y | $17,758,437.00 |
| Principal MidCap Fund  R5 | $12,950,524.00 |
| T Rowe Price Retirement 2010 Fund ADV | $5,026,186.00 |
| JPMorgan Small Cap Growth Fund R5 | $18,722,383.00 |
| Invesco Comstock Fund  Y | $17,340,265.00 |
| Franklin Rising Dividends Fund ADV | $11,637,069.00 |
| Hartford MidCap Fund  Y | $17,634,303.00 |
| T Rowe Price Retirement 2060 Fund ADV | $1,274,704.00 |
| DWS Small Cap Core Fund  S | $9,499,673.00 |
| Victory Sycamore Established Value Fund I | $15,999,513.00 |
| Total: | $314,487,540.00 |

112.    In several instances during the Class Period, Defendants failed to prudently monitor
the Plan to determine whether the Plan was invested in the lowest-cost share class available for the
Plan's mutual funds.

113.    The below chart uses 2021 expense ratios to demonstrate cost differentials between
the applicable mutual funds and the cheaper identical shares:

| Fund in the Plan | ER | Less Expensive Share Class | Less Expensive ER | Excess Cost |
|---|---|---|---|---|
| T Rowe Price Retirement 2030 Fund ADV | 0.90% | T Rowe Price Retirement 2030 Fund I | 0.49% | 84% |
| T Rowe Price Retirement 2040 Fund ADV | 0.95% | T Rowe Price Retirement 2040 Fund I | 0.51% | 86% |
| T Rowe Price Retirement 2050 Fund ADV | 0.96% | T Rowe Price Retirement 2050 Fund I | 0.52% | 85% |
| PIMCO Total Return Fund; Admin | 0.96% | PIMCO Total Return Fund I | 0.71% | 35% |
| Fidelity Blue Chip Growth Fund | 0.80% | Fidelity Blue Chip Growth Fund K | 0.70% | 14% |
| Invesco Oppen International Growth Y | 0.85% | Invesco Oppen International Growth R | 0.69% | 23% |
| Principal MidCap Fund R5 | 0.85% | Principal MidCap Fund I | 0.69% | 23% |
| T Rowe Price Retirement 2010 Fund ADV | 0.77% | T Rowe Price Retirement 2010 Fund I | 0.37% | 108% |
| JPMorgan Small Cap Growth Fund R5 | 0.84% | JPMorgan Small Cap Growth R6 | 0.74% | 14% |
| Invesco Comstock Fund Y | 0.49% | Invesco Comstock Fund R6 | 0.40% | 23% |
| Franklin Rising Dividends Fund ADV | 0.62% | Franklin Rising Dividends Fund Class R6 Shares | 0.53% | 17% |
| Hartford MidCap Fund Y | 0.79% | Hartford MidCap Fund R6 | 0.75% | 5% |
| T Rowe Price Retirement 2060 Fund ADV | 0.96% | T Rowe Price Retirement 2060 I | 0.52% | 85% |
| DWS Small Cap Core Fund S | 0.89% | DWS Small Cap Core I | 0.84% | 6% |
| Victory Sycamore Established Value Fund I | 0.60% | Victory Sycamore Established Value R6 | 0.58% | 3% |

114.   The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

115.   There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less

expensive counterparts, the more expensive share class funds *could not have* (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

116.    In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduced the likelihood that Plan participants would achieve their preferred lifestyle in retirement.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

117.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

118.    At all relevant times, the Committee Defendants and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

119.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

120.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to control the administrative and recordkeeping expenses of the Plan and to investigate the availability of lower-cost identical products of certain mutual funds in the Plan.

121.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

122.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

123.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against United Surgical)**

35

124.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

125.    United Surgical (the "Monitoring Defendant") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

126.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

127.    The Monitoring Defendant also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

128.    The Monitoring Defendant breached its fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of identical lower-cost funds; and

(c)    failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and

36

poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

129.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendant complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

130.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's

assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: April 15, 2022                    **THE LAW OFFICES OF DAN E. MARTENS**

/s/ Dan E. Martens
Dan E. Martens
TX State Bar No. 13050500
17101 Preston Road, Suite 160 S
Dallas, TX  75248
Tel.:  972-335-3888
Fax:  972-335-5805
Email:  dmartens@danielmartens.com

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey
Donald R. Reavey, Esquire
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class